**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**GEORGE SZCZEKLIK and**
**MARTA SZCZEKLIK, as Assignees**
**of NEUBERT AERO CORP.,**

       **Plaintiffs,**

**vs.**                                    **Case No. 8:12-CV-970-T-27TGW**

**MARKEL INTERNATIONAL**
**INSURANCE COMPANY, LIMITED,**

       **Defendant.**
_____/

**ORDER**

**BEFORE THE COURT** are Defendant's Motion for Summary Judgment (Dkt. 12) and Plaintiffs' Motion for Summary Judgment (Dkt. 15). Because the undisputed evidence reveals that Markel International Insurance Company, Limited ("**Markel**") wrongfully refused to defend and indemnify Neubert Aero Corp. ("**Neubert**") in connection with certain underlying litigation brought by George Szczeklik and Marta Szczeklik (the "**Plaintiffs**"), Plaintiffs are entitled to summary judgment as a matter of law.

**Introduction**

The issue in this case is whether Markel had a duty to defend and indemnify Neubert in connection with a personal injury action brought against Neubert by Plaintiffs in Pinellas County Circuit Court. Plaintiffs, as assignees of Neubert's rights under the insurance policy, assert that no genuine issues of material fact exist and that they are entitled to judgment as a matter of law. Markel responds that the undisputed facts demonstrate that it had no duty to defend and indemnify Neubert under various insurance policy provisions and, therefore, it is entitled to summary judgment.

## Factual and Procedural Background

Neubert was an authorized Dealer/Distributor of "Runway Continuous Friction Measuring Equipment (CFME, Mu-Meter Mk6 Airports)" manufactured by Douglas Equipment Limited and approved by the Federal Aviation Administration for testing and compiling runway friction measurements (*i.e.*, "**Mu-Meters**"). *See, e.g.,* Deposition of Ronald Hopkins (Dkt. 14-1, Dkt. 14-3), pp. 24-28, 103-04.  Neubert was also involved in the supply of parts, equipment, and service related to Mu-Meters in the United States. *See, e.g.*, Deposition of Ronald Hopkins (Dkt. 14-3), pp. 103.[1]

On or about September 21, 2004, Neubert requested that Safe Start, Inc. ("**Safe Start**") mount a tire onto a rim that Neubert brought to Safe-Start in connection with the assembly of a Mu-Meter (or a spare wheel to be supplied in connection with an existing Mu-Meter). *See, e.g.*, Deposition of Ronald Hopkins (Dkt. 14-1), pp. 28-30.[2]  The rim was a "split" rim – meaning that it was actually composed of two rims that were bolted together.  Neubert supplied the tire, rim, bolts, nuts, and other materials necessary to mount the tire (the "**Wheel Assembly**").  The completed Wheel Assembly was intended to be returned to Neubert for distribution in the normal course of Neubert's business. *See, e.g.*, Deposition of Lynette Smith (Dkt. 14-4), pp. 9-10.[3]  Safe Start

---

[1] A Mu-Meter consists of a small three-wheeled trailer incorporating electronic measuring systems operating in conjunction with a touch screen laptop computer which is carried in a towing vehicle. The Mu-Meter function and design is described in the deposition of Ronald Hopkins who was the a director of the special products division at Douglas Equipment Limited. *See, e.g.*, Deposition of Ronald Hopkins (14-1), pp. 7, 20-26; *see also* http://douglas.cwfc.com/tractors/spokes/05_Mu-Meter.htm (last visited April 24, 2013).

[2] Because of sourcing issues relating to the rims and tires for Mu-Meters, Neubert often sold its clients a spare assembled wheel at the same time the client purchased a new Mu-Meter. *See, e.g.,* Deposition of Ronald Hopkins (Dkt. 14-1,) p. 30.

[3] Markel contends that neither the Complaint nor Second Amended Complaint in the underlying litigation alleged how or why Neubert was going to use the Wheel Assembly.  This contention is tenuous, at best, given that an insurance company is presumed to know the nature of an insured's business. *See New Amsterdam Cas. Co. v. Knowles*, 95 So. 2d 413, 414 (Fla. 1957) ("When the policy was issued...the insurer should have become aware of the nature of the enterprise in which the [insureds] were engaged."); *Ritchie v. Anchor Cas. Co.*, 286 P.2d 1000, 1008 (Cal. App. Ct..

declined to assemble the rim, asserting that they required certain "torque" or other specifications for assembly as to which Safe Start lacked sufficient knowledge.  Safe Start requested that Neubert assemble the rim itself and then return the assembled rim to Safe Start for mounting of the tire.

On or about September 22, 2004, Neubert returned to Safe Start with the rims bolted together and again requested that Safe Start mount the tire onto the rim.  George Szczeklik, an employee of Safe Start, was assigned the task of mounting the tire onto the rim supplied by Neubert.  While Mr. Szczeklik was inflating a tire on the rim, the two halves of the "split" rim explosively separated causing serious injury to Mr. Szczeklik.

### The Underlying Litigation

On or about October 19, 2007, Plaintiffs filed a Complaint against Neubert asserting claims for negligence and loss of consortium.  The Complaint alleged that Neubert breached its duty of care to Mr. Szczeklik by furnishing Safe Start with a Wheel Assembly that contained bolts which were inadequate for the purpose of mounting the tire onto the rim.  *See* Complaint (Dkt. 2-3), ¶ 10.

On or about September 19, 2008, Plaintiffs filed a Second Amended Complaint against Neubert, Douglas Equipment Ltd., and Watts Industrial Tyres PLC.  The Second Amended Complaint clarified the factual basis for the negligence claim against Neubert.  Specifically, Plaintiffs alleged that Neubert breached its duty of care to George Szczeklik by providing him with

---

1955) ("The insurer is presumed to have known of the nature of applicant's business ... ."); *Globe & Rutgers Fire Ins. Co. v. Indiana Reduction Co.*, 113 N.E. 425, 429 (Ind. App. Ct. 1916) ("The law charges insurance companies with the duty of informing themselves as to the usages of the particular business insured, and a knowledge of such usage on the part of such company will be presumed."); *see also Poole v. Travelers Ins. Co.*, 179 So. 2d 138, 143 (Fla. 1938) (holding that facts within the knowledge of an insurance agent are deemed facts within the knowledge of the insurance company); *Pelzer Mfg. v. Sun Fire Office of London*,15 S.E. 562, 583 (S.C. 1892) (holding that "[i]nsurance companies, or their agents, are, of course, presumed to know what facts and circumstances are material to the risk offered"); *cf. Hazard Adm'r v. New England Marine Ins. Co.*, 33 U.S. 557 (1834) ("Underwriters are presumed to know the usages of the trade and customs of all the places from or to which they make insurances.")

a negligently assembled rim and by failing to warn him of dangers associated with mounting the tire onto the rim at issue.  *See* Second Amended Complaint (Dkt. 2-3), ¶¶ 16-17.

### *The Insurance Policy and Denial of Coverage*

Markel insured Neubert under a Commercial General Liability Policy (Certificate No. GLSC3154) for the period of February 27, 2004, through February 27, 2005 (the "**Policy**").[4]  After being placed on notice of the Plaintiffs' claims against Neubert, Markel refused to defend or indemnify Neubert contending that certain amendatory endorsements to the Policy excluded coverage.  The Policy contained three endorsements relied on by Markel in denying coverage:

> **Exclusion – Productions – Completed Operations Hazard**: "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products – completed operations hazard.'"
>
> \*\*\*\*\*
>
> **Limitation of Coverage to Designated Premises or Project**: "This insurance applies only to 'bodily injury,' 'advertising injury,' and medical expenses arising out of ... the ownership, maintenance or use of the premises shown in the [Declarations] and operations necessary or incidental to those premises ... or [t]he project shown in the schedule."
>
> \*\*\*\*\*
>
> **Classification Limitation**: "This insurance applies only to locations and operations described on the Declarations page or Extension of Declarations of this policy.  If any operation(s) or location(s) are not described, they are not covered hereunder."[5]

---

[4] A copy of the Policy is attached to the Complaint as Exhibit A.

[5] The Declarations identify the premises as Neubert's principal place of business and describe Neubert's business as that of a "Distributor."

### *The Settlement Between Neubert and Plaintiffs*

After Markel denied coverage and refused to defend Neubert in the underlying litigation, Neubert and Plaintiffs entered into a Joint Stipulation and Agreement (Dkt. 13-1) whereby they agreed to a stipulated judgment in the amount of $375,000. As part of the settlement, Neubert also assigned its rights under the Policy to Plaintiffs with respect to the events giving rise to Plaintiffs' claims. Final Judgment was entered in favor of Plaintiffs on December 7, 2011 (Dkt. 13-1).

### *The Pending Litigation*

Plaintiffs, as assignees of Neubert, commenced this action by filing a single count Complaint against Markel alleging that Markel breached the Policy by failing to defend and indemnify Neubert in the underlying litigation. *See* Complaint (Dkt. 2). Plaintiffs seek damages in the amount of $375,500 (*i.e.*, the Final Judgment in the underlying litigation) together with interest, costs, and attorney's fees.

### <u>Standard on Summary Judgment</u>

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party. *Id.*

### Florida Law Relating to the Interpretation of Insurance Policies

The interpretation of an insurance contract is a question of law. *See Graber v. Clarendon Nat'l Ins. Co.*, 819 So.2d 840, 842 (Fla. 4th DCA 2002). The policy must be read as a whole, and every provision must be accorded its full meaning and operative effect. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So.2d 938, 941 (Fla. 1979) (noting that every provision in a contract should be given meaning and effect and apparent inconsistencies reconciled if possible); *see also Dahl-Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993).

"[A] court cannot rewrite an insurance contract to extend coverage beyond what is clearly set forth in the contractual language." *Florida Residential Prop. & Cas. Joint Underwriting Ass'n v. Kron*, 721 So.2d 825, 826 (Fla. 3d DCA 1998). It is well-settled that insurance contracts are to be construed in accordance with the plain language of the policy, with any ambiguity interpreted liberally in favor the insured and against the insurer. *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d

6

29, 34 (Fla. 2000); *see Fayad v. Clarendon Nat'l Ins. Co.*, 899 So.2d 1082, 1086 (Fla. 2005) ("[a]mbiguous coverage provisions are construed strictly against the insurer that drafted the policy and liberally in favor of the insured").  Policy language is considered ambiguous if the language is susceptible to more than one reasonable interpretation. *Travelers Indem. Co. v. PCR Inc.*, 889 So.2d 779, 785 (Fla. 2004).

"When an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely within the policy exclusion and are subject to no other reasonable interpretation.  Exclusionary clauses are generally disfavored." *Hartford Accident and Indem. Co. v. Beaver*, 466 F.3d 1289, 1296 (11th Cir. 2006) (quoting *Northland Cas. Co. v. HBE Corp.*, 160 F.Supp.2d 1348, 1359 (M.D. Fla. 2001)) (internal citations omitted); *see Ajax Bldg. Corp. v. Hartford Fire Ins. Co.*, 358 F.3d 795, 799 (11th Cir. 2004) (noting that "in Florida exclusionary clauses are construed more strictly than coverage clauses, and if exclusions are ambiguous or susceptible of more than one meaning, they must be construed in favor of coverage"). The burden of demonstrating the applicability of an exclusionary clause falls on the insurer. *See, e.g.*, *Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1309 (11th Cir. 2008) (citing *U.S. Concrete Pipe Co. v. Bould*, 437 So.2d 1061, 1065 (Fla. 1983)).

### Discussion

Plaintiffs argue that the allegations in the underlying litigation brought their injuries within the coverage afforded by the Policy.  Plaintiffs further argue that the allegations and discovery[6] in

---

[6] In determining whether Markel had a duty to defend Neubert in the underlying litigation, it is improper to consider discovery or other extrinsic evidence because "[t]he duty of an insurer to defend is determined solely by the allegations of the complaint against the insured, not by the actual facts, nor the insured's version of the facts or the insured's defenses." *Reliance Insurance Company v. Royal Motorcar Corporation*, 534 So.2d 922, 923 (Fla. 4th DCA 1988).

7

the underlying litigation demonstrated that no policy limitation or exclusion was triggered and, therefore, Markel owed a duty to both defend and indemnify Neubert.  Markel argues that it properly denied all requests for defense and indemnification in the underlying litigation based on three endorsements contained in the Policy.  The applicability of each of the three policy provisions is discussed below.

> **(1)    Designated Premises or Project Endorsement**: "This insurance applies only to 'bodily injury,' 'advertising injury,' and medical expenses arising out of ... the ownership, maintenance or use of the premises shown in the [Declarations[7]] and operations necessary or incidental to those premises ... or [t]he project ... ."

Markel contends that under this endorsement, the Policy does not provide coverage for the injury to Mr. Szczeklik because it occurred at Safe Start's premises and the Policy expressly limits coverage to "bodily injury" or "property damage" occurring at Neubert's premises as defined in the Policy.  In response, Plaintiffs argue that coverage is not limited to injuries occurring on the premises and that the endorsement, when read together with the Policy as a whole, requires coverage for injuries which arise from operations incidental to the business conducted on the insured's premises.

In this case, the rim was alleged to have been assembled at Neubert's principal place of business and, therefore, the conduct giving rise to the underlying litigation involved operations arising out of, and necessary and incidental to, Neubert's business premises.  A designated premises or project endorsement does not exclude coverage when either the negligent acts occur at the designated premises and/or the injury occurs at a location close to the designated premises and arose from operations incidental to the business conducted on the insured premises.  *See American Guar.*

---

[7] The Endorsement provides that if no entry appears on the Schedule contained in the endorsement, that "the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement." As noted, the Declarations identified Neubert's principal place of business at 4707 140th Ave. N., Ste. 317, Clearwater, Pinellas County, FL 33762-3841 and describe Neubert's business as that of "distributor."

*& Liab. Ins. Co. v. 1906 Co.*, 273 F.3d 605, 616-17 (5th Cir. 2001) (finding coverage exists for offenses committed off the designated premises when the decisions which ultimately led to the incident were made at the designated premises); *State Auto. & Cas. Underwriters v. Beeson*, 516 P.2d 623, 625-26 (Colo. 1973) (coverage provided for owner's negligence in throwing keys from designated premises thereby injuring nearby child); *see also Cycle Chem, Inc. v. Lumbermen's Mutual Cas. Co.*, 837 A.2d 1149, 1155-56 (N.J. Supp. Ct. App. Div. 2003) (reversing summary judgment in favor of insurer and remanding for determination of whether a sufficient factual nexus existed between off-premises occurrences and insured's necessary and incidental operations at the insured premises).[8]

Even if the assembly of a tire and rim were not "operations necessary or incidental to" the premises, the endorsement also provides that the Policy provides coverage for bodily injuries arising out of or incidental to "the project shown in the schedule."   In this case, "project" is not defined in the endorsement, but the Declarations describe Neubert's business as that of a "distributor" of Mu-Meters.   An injury  resulting from Neubert's negligence in connection with the assembly and preparation of a rim related to a product it distributes (*i.e.*, the Mu-Meter) can reasonably be construed to arise out of the business (*i.e.*, "project") being conducted by Neubert as a distributor of

---

[8] While other decisions focus on the place of the accident, not the place of the negligent act giving rise to the injury, these cases generally involve automobile liability insurance policy provisions and are distinguishable based on the applicable policy language. *See Allstate Ins. Co. v. Shofner*, 573 So.2d 47, 50-51 (Fla. 1st DCA 1990) (holding that provision excluding coverage for entrustment of motorized off-road recreational vehicle owned by insured and used away from the insured premises applied to accident resulting when insureds' daughter allowed friend to operate all-terrain vehicle on public street one block away from insureds' residence, even though entrustment itself occurred on premises); *St. Paul Fire & Marine Ins. Co. v. Circle Bar J Boys' Ranch, Inc.*, 461 P.2d 567, 569 (Wash. Ct. App. 1969) (coverage does not apply " to the ownership, maintenance or use including loading or unloading, of (1) automobiles while away from premises (or the ways immediately adjoining) owned, rented or controlled by the Insured"); *DeWitt v. Nationwide Mutual Fire Ins. Co.*, 672 N.E.2d 1104, 1107-08 (Ohio Ct. App. 1996) (interpreting motor vehicle exclusion); *see also Chiquita Brands Int'l, Inc. v. National Union Fire Ins. Co. of Pittsburgh*, No C-120019, 2013 WL 836861, at *5-6 (Ohio. App. Ct.  Mar. 6, 2013) (policy excluded coverage where injury was caused by an occurrence that takes place outside the "coverage territory").

Mu-Meters. *See Markel Int'l Ins. Co. Ltd. v. Erekson*, 279 P.3d 93, 96 (Idaho 2012) ("[f]or there to be coverage for bodily injury arising out of the project, the bodily injury need not also arise out of the ownership, maintenance, or use of the premises"); *see also 3139 Properties, LLC v First Speciality Ins. Corp.*, Civil No. 06-00619 SOM/LEK, 2007 WL 1701922, at *5 (D. Haw. June 8, 2007) (noting that while the policy, inclusive of the designated premises/operation endorsement, covered claims for bodily injury arising out of a construction project, it did not cover all claims arising out of the project (*i.e.*, claims for breach of contract)).[9]

In this case, the injury arose out of operations incidental to Neubert's business as a distributor so as to fall within the scope of the designated premises *or* project endorsement.  In similar circumstances, Florida courts have applied an expansive interpretation of the designated premises or project endorsement.  For example, in *Southeast Farms, Inc. v. Auto-Owners Ins. Co.*, 714 So.2d 509 (Fla. 5th DCA 1998), the court held that a designated premises endorsement did not preclude coverage for insured's liability for off-premises negligence in failing to inspect truck and determine qualifications of driver. *Id.* at 511.  The court found that moving potatoes from farmer to buyer was incidental to the insured potato broker's business and therefore were operations necessary or incidental to the designated premises.  *Id.*

At best, the premises or project endorsement reflects a flawed attempt to convert what

---

[9] The subject Policy is labeled a Commercial General Liability Policy and, therefore, this case is distinguishable from those interpreting Owner's, Landlord's, and Tenant's Policies which are designed to insure against liability arising from the condition or use of a building.  See *Southeast Farms, Inc. v. Auto-Owners Ins. Co.*, 714 So.2d 509, 512 n.4 (Fla. 5th DCA 1998).  A Commercial General Liability Policy commonly covers "[l]iability arising out of a business enterprise ... ."  *Id.*

purports on its face to be a Commercial General Liability Policy into a premises liability policy.[10]

Under Florida law, language used to convert a Commercial General Liability Policy to a premises

liability policy, through a designated premises endorsement, must be clear and unequivocal.  *See*

*American Empire Surplus Lines Ins. Co. v. Chabad House of North Dade, Inc.*, 771 F.Supp.2d 1336,

1343 (S.D. Fla. 2011).[11]  In *Chabad House*, the court held that under Florida law, a designated

premises endorsement to a Commercial General Liability Policy issued to a volunteer agency

responsible for sending teenage volunteers into homes of families who had special needs children

did not exclude coverage for acts which occurred away from the volunteer agency's office.  *Chabad*

*House,* 771 F. Supp. 2d at 1344.  The court relied on contradictory language in the policy which

defined coverage territory to include the United States, Canada, Puerto Rico, and other parts of the

---

[10] "[A] building liability [or premises] policy does not cover a liability ***arising*** from the insured's activity in the building." *Union America Ins. Co. v. Haitian Refugee Center/Sant Refijie Ayisyin, Inc.*, 858 So.2d 1076, 1078 (Fla. 3d DCA 2003) (emphasis added) (limitation provision effectively converted Commercial General Liability Policy into the equivalent of a premises or owner's, landlord's and tenant's policy).  In contrast, the designated premises or project endorsement in this case applies to bodily injury "arising out of" the premises or ***the project***.  As such, it is unnecessary to rewrite the Policy to substitute "business" for the word "premises" as was the case in *Union America*.  Moreover, the mounting of a tire on a rim supplied by Neubert bears a much closer causal connection to the designated premises than did the shooting death of an individual at a street rally sponsored by the insured in *Union America*.  *See also Hartford Fire Ins. Co. v. Annapolis Bay Charters, Inc.*, 69 F.Supp.2d 756, 760 (D. Md. 1999) (concluding that language in policy limiting coverage to injuries "arising out of the ownership, maintenance or use of the premises described in the Declarations and operations necessary or incidental to those premises" – without reference to project or business conducted on the premises – created a premises liability policy).

[11] "[A] building liability policy does not cover a liability ***arising*** from the insured's activity in the building." *Union America Ins. Co. v. Haitian Refugee Center/Sant Refijie Ayisyin, Inc.*, 858 So.2d 1076, 1078 (Fla. 3d DCA 2003) (emphasis added) (limitation provision effectively converted Commercial General Liability Policy into the equivalent of a premises or owner's, landlord's and tenant's policy).  In contrast, the designated premises/project endorsement in this case applies to bodily injury "arising out of" both the premises and ***the project***.  As such, it unnecessary to rewrite the policy to substitute "business" for the word "premises" as was the case in *Union America*.  Moreover, the mounting of a tire on a rim supplied by Neubert bears a much closer causal connection to the designated premises than did the shooting death of an individual at a street rally sponsored by the insured in *Union America*.  *See also Hartford Fire Ins. Co. v. Annapolis Bay Charters, Inc.*, 69 F.Supp.2d 756, 760 (D. Md. 1999) (concluding that language in policy limiting coverage to injuries "arising out of the ownership, maintenance or use of the premises described in the Declarations and operations necessary or incidental to those premises" – without reference to project or business conducted on the premises – created a premises liability policy).

world, to find the designated premises endorsement ambiguous.  *Id.*[12]

Like in *Chabad House*, the designated premises endorsement in this case does not clearly and unequivocally convert the Policy from a Commercial General Liability Policy to a premises liability policy.  *See id.* at 1344 (citing *Premier Ins. Co. v. Adams*, 632 So.2d 1054 (Fla. 5th DCA 1994) (ambiguous policy language is construed against the insurer).[13]

Plaintiffs also contend that because the Policy provides coverage for "advertising injury" (*i.e.*, an injury Plaintiffs contend by definition occurs away from the designated premises), the Policy must necessarily provide coverage for other injuries occurring away from the designated premises.  While this argument has some support in the case law,[14] other courts have construed similar policy

---

[12] Similarly, in this case, the Policy defines "coverage territory" to include the United of America.  *See* Policy (Dkt. 2-1), Section V.4.  That is, the Policy provides that "[t]his insurance applies to 'Personal Injury' caused by an offense arising out of your business ... but only if the offense was committed in the 'coverage territory' during the policy period."  This language would be superfluous if the Policy only applied to injuries suffered on Neubert's premises.  *See Dash Messenger Service, Ltd. v. Hartford Ins. Co. of Illinois*, 582 N.E.2d 1257, 1262 (Ill. App. Ct. 1991) (noting reasonable purchaser might infer that if policy coverage were limited solely to occurrences on the premises that designation of coverage territory would be superfluous; reversing summary judgment in favor of insurer because an ambiguity in policy under the facts and circumstances of the case raised material issue of fact concerning parties' intent to cover off-premises occurrences, including bicycle accident).

[13] Another indication of a premises policy which is not present in this case is when the insurance premium is calculated based on the square footage of the insured premises.  *See First Speciality Ins. Corp. v. Southern Transp., Inc.*, No. 2:06-cv-02199-JPM-jha (W.D. Tenn. Apr. 27, 2007), *affirmed*, 355 Fed. App'x 815 (5th Cir. 2009) (noting that when premium is based on square footage rather than, for example payroll or revenue, the premium basis used supports contention that policy was a "premises" policy); *First Speciality Ins. Corp. v. United States Aquaculture Licensing*, No. 1:07CV98-SA, 2008 WL 5191668 (N.D. Miss. Dec. 10, 2008) (when policy premium is based on square footage, operations covered by the policy are limited to those operations located on the premises).

[14] *See Certified Interested Underwriters at Lloyd's of London Subscribing to Certificate of Insurance No. 9214 v. Halikoytakis*, No. 8:09-CV-1081-T-17TGW, 2011 WL 1296816, at *7 (M.D. Fla. Mar. 31, 2011) (noting that the coverage for advertising injury liability is an indicator of commercial general liability insurance policy, but concluding that policy at issue was a landlord/tenant policy and not a commercial general liability policy); *Chabad House*, 771 F. Supp. 2d at 1344 (noting that coverage for "advertising injury," a tort not tied to the premises, within a designated premises endorsement "creates sufficient confusion" and ambiguity).

provisions to exclude coverage for injuries occurring away from the designated premises.[15]

In sum, coverage for the Mr. Szczeklik's injuries falls within a plain reading of the designated premises or project endorsement to the Commercial General Liability Policy because those injuries arose out of operations incidental to the designated premises and Neubert's business. Moreover, even if the endorsement was ambiguous due to the conflicting language in the Policy as a whole (*e.g.*, coverage territory, advertising injury), any such ambiguity must be construed against Markel so as not to exclude coverage for Mr. Szczeklik's injury. *See LeFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997) (noting that burden of proving an exclusion to coverage is on the insurer) (citing *Hudson Ins. Co. v. Double D. Management Co., Inc.*, 768 F.Supp. 1542 (M.D. Fla. 1991)); *Auto-Owners Ins. Co.*, 756 So.2d at 34 (noting that exclusionary clauses, if ambiguous, are construed even more strictly against the insurer than coverage clauses).

> **(2)** **Exclusion – Productions – Completed Operations Hazard Endorsement**: "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products – completed operations hazard.'"[16]

Markel argues that the Wheel Assembly was a "product" handled by Neubert and, therefore, any bodily injury arising from the assembled rim fell within the "products-completed operations hazard" exclusion. *See* Policy (Dkt. 2-1), § V.18. ("'Your product' means (a) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by ... [y]ou ... ."). In response, Plaintiffs contend that the assembled rim constituted "uninstalled equipment"

---

[15] *See Accessories Biz, Inc. v. Linda and Jay Keane, Inc.*, 533 F.Supp.2d 381, 388-89 (S.D.N.Y. 2008) (concluding that designated premises endorsement was not sufficiently broad to encompass business-related activity occurring away from designated Florida premises; New York showroom was not necessary and incidental to jewelry retailers operations conducted in Florida office).

[16] The Products-completed operations hazard "includes all 'bodily injury' ... occurring away from premises you own or rent and arising out of 'your product' or 'your work' *except ... products that are still in your physical possession [or] work that has not yet been completed or abandoned.*" Policy (Dkt. 2-1), § V.14 (emphasis added).

and, therefore, the injury to Mr. Szczeklik did not fall with the products-completed operations hazard exclusion.  *See* Policy (Dkt. 2-1), § V.14  ("The 'Products-Completed operations hazard' does not include '[t]he existence of tools, uninstalled equipment or abandoned or unused materials ... .'").

A plain reading of the Policy demonstrates that the product in this case (*i.e.*, the rim) was not a "completed" product ready for resale by Neubert, but rather was a component of a final product akin to a work in progress.  *See Hydro Systems, Inc. v. Continental Ins. Co.*, 929 F.2d 472, 475 (9th Cir. 1991) ("[s]everal courts have examined the meaning of the term 'product' as it relates to the products operation hazard exceptions.  The majority of courts define 'products' as goods or service which the insured deals in as his stock and trade"); *Bituminous Cas. Corp. v. St. Clair Lime Co.*, No. 94-6436, 1995 U.S. App. LEXIS 30948, at *14 (10th Cir. Oct. 27, 1995) (noting that courts have traditionally defined 'products' for purposes of the completed operations exclusion as the "goods or services which the insured deals in as his stock or trade"); *Cincinnati Ins. Companies v. Tennessee Log Homes, Inc.*, No. 1:05-CV-7, 2008 WL 2944914, at *8 (E.D. Tenn. July 25, 2008) (defining "products" for purposes of completed operations exclusion as "something that is distributed commercially for use or consumption"); *Steyer v. Westvaco Corp.*, 450 F. Supp. 384, 392-93 (D. Md. 1978) ("product" in definition of "products hazard" "refers to the physical objects which the insured, for example, manufacturers and transfers to others as the insured's stock in trade").  In this case, the rim was not a completed product (*i.e.,* goods which Neubert dealt in as its stock or trade or that Neubert distributed commercially for use or consumption) and, indeed, would not be a completed product until such time as the tire was combined with the rim to create a product Neubert could distribute or sell to an ultimate consumer of its products.

14

On the other hand, Plaintiffs' attempt to refer to the assembled rim as "uninstalled equipment" finds only limited support in the case law.  *See Chancler v. American Hardware Mut. Ins. Co.*, 712 P.2d 542, 549 (Idaho 1985) ("An injury from improperly installed equipment is legally equivalent to an injury resulting from uninstalled equipment.").  In general, courts interpreting the term "uninstalled equipment" have held that it refers only to equipment that on completion of an operation should have been removed by the insured from the premises where the operation occurred but which, instead, were abandoned by the insured and later were instrumental in causing an accident.  *See Shelter Mut. Ins. Co. v. DeShazo*, 955 S.W.2d 234, 237 (Mo. App. Ct. 1997) (citing cases); *see also St. Paul Fire & Marine Ins. Co. v. CSX Transp., Inc.*, 502 F.Supp.2d 792, 803 (C.D. Ill. 2007).

Markel's reliance on the fact that the assembled rim was Neubert's "completed product" because it was "handled" by Neubert is equally specious.  While the assembled rim may have been handled by Neubert, it cannot properly be viewed as a "completed product" for purposes of the products-completed operations hazard exclusion because it was merely a component of the "product," not a completed or finished product subject to the ordinary channels of commerce (*i.e.*, Mu-Meters or the fully assembled Wheel Assembly).

> The completed operations hazard or products hazard exclusion is commonly referred to as the ***products liability exclusion*** and understood to apply to specialized circumstances of loss caused by the use of goods or products manufactured or produced.  The terms goods or products manufactured, sold, handled or distributed in the clause defining the insured's products, when read together, imply ***goods which are processed or assembled in the ordinary channels of commerce***.

*Associated Elec. and Gas Ins. Services, Ltd. v. Houston Oil and Gas Co.*, 552 So.2d 1110, 1111 (Fla.

3d DCA 1989) (emphasis added) (quoting *Prosser Comm'n Co. v. Guaranty Nat'l Ins. Co.*, 700 P.2d 1188, 1191 (Wash. App. Ct. 1985)); *compare Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co.*, 913 So.2d 528, 539-40 (Fla. 2005) (products-completed operations hazard exclusion operates to exclude coverage for claims against a gun manufacturer where the injuries alleged were caused by the guns the defendants had manufactured).

The assembled rim cannot reasonably be construed to represent work that has been completed by Neubert. Neubert did not permanently relinquish its work or product to Safe Start, but rather temporarily released the tire and rim with the intention of taking the completed Wheel Assembly back after the tire was successfully installed on the rims. *See* 9A *Couch on Insurance* § 129.23 (3d ed. 2012) ("'Completed operations' provisions refer to bodily injury and property damage which occur away from premises owned by or rented to the insured, and after the insured has completed work or relinquished custody of its product.") (emphasis added); *see also Orthopedic Resources, Inc. v. Nautilus Ins. Co.*, 654 F.Supp. 1307, 1314-15 (N.D. Okla. 2009) (injury to medical equipment renter after insured's agent provided renter with equipment did not come within completed operation exclusion in insured's policy; insured's work would be completed when agent's work was completed, and since renter was to use the equipment and then return it, agent's work was not completed until that unit was returned). Again, the mounting of the tire and rim was a component of the manufacturing process (*i.e.*, the "work") and the fact that Neubert furnished the assembled rim to Safe Start for the purpose of completing a step in the manufacturing process demonstrates that Neubert's work was not complete for purposes of the products-completed operations hazard exclusion.

16

In sum, Markel has failed to meet its burden of demonstrating that the products-completed operations hazard exclusion applies so as to excuse it from defending and indemnifying Neubert in the underlying litigation.  *See Penzer*, 545 F.3d at 1309.[17]

> **(3)     Classification Limitation Endorsement**: "This insurance applies only to locations and operations described on the Declarations page or Extension of Declarations of this policy.  If any operation(s) or location(s) are not described, they are not covered hereunder."[18]

Markel contends that Plaintiffs sued Neubert for a defective rim assembly (or failure to provided warnings relating the dangers associated with mounting tires on the rim) which was an event wholly unrelated to the classification of distributor set forth in the Policy.  Markel's contention that coverage for Plaintiffs' claims was barred by the classification limitation endorsement is not persuasive given that Neubert's assembly of the rim was incidental to its business as a distributor.

The Policy describes Neubert as a distributor and the undisputed facts demonstrate that Neubert is a distributor of Mu-Meters and related parts.[19]  Neubert was also acting as a distributor when it presented the rim to Safe Start because it intended to sell the completed Wheel Assembly to a client (either as a spare or as part of a new Mu-Meter).  The process of combining the tire and rim was one step, indeed an essential step, in the distribution process.

---

[17] In *Florida Farm Bureau Mut. Ins. Co. v. Gaskins,* 405 So.2d 1013 (Fla. 1st DCA 1981), relied on by Markel, the court actually found coverage existed because liability arose out of appellee's on-premise negligence in delivering the wrong product rather than out of the product delivered.  *Id.* at 1014-15.

[18] As noted, the Declarations page of the Policy describe Neubert's business as that of a "Distributor" and classifies Neubert's business for premium purposes as "Distributors no food or drink."

[19] Because Markel was deemed to be aware of the nature of Neubert's business (*i.e.,* the distribution of Mu-Meters and related parts, including wheels and tires), *see* footnote 3, *supra*, it should have been evident from the face of the pleadings in the underlying litigation that, at the very least, Plaintiffs' claims could fairly and potentially fall within the scope of the Policy's coverage.

17

Unlike the cases relied on by Markel, this is not a situation where a policy defines the insured's business as a subclass within a particular industry (*i.e.*, residential vs. commercial contractor) or limits coverage to a specific project (*i.e.,* indoor vanities vs. fence work).[20]  Instead, the Policy broadly defines Neubert's business as that of a distributor, a business that can reasonably be interpreted to include both the resale of manufactured products and the preparation of such products for resale.[21]

The allegations in the underlying litigation were in no way inconsistent with the fact that the rim was a part or component of a product distributed by Neubert (*i.e.*, a Mu-Meter) and, therefore,

---

[20] *Compare Evanston Ins. Co. v. Heeder*, 490 Fed. App'x 215, 217 (11th Cir. 2012) (insurer had no duty to defend or indemnify its insured residential roofing contractor with respect to a lawsuit related to roofing work on commercial property); *First Speciality Ins. Corp. v. Mississippi State Univ.*, 355 Fed. App'x 815, 816-17 (5th Cir. 2009) (policy limited coverage to the premises and did not include product liability coverage where classification of coverage was for buildings or premises and policy premiums were based on square footage of premises); *Essex Ins. Co. v. Davis*, No. 3:08-cv-1078-AH, 2009 WL 232088, *4 (N.D. Tex. Aug. 7, 2009) (insurer had no duty to indemnify insured for damages to synagogue when business description was limited to residential roofing); *Potters House Fellowship Baptist Church v. Matthews*, No. 3:06-cv-154 HTW-LRA, 2008 WL 907514, at *2 (S.D. Miss. Mar. 31, 2008) (construction of church did not fall within coverage limitation that limited coverage to residential construction); *New York City Housing Authority v. United States Underwriters Ins. Co.*, 7 A.D.2d 393, 394 (N.Y. Sup. Ct. 2004) (policy limited to a contract for the construction of indoor vanities did not cover outdoor fence work); *Ruiz v. State Wide Insulation and Construction Corp.*, 269 A.D.2d 518, 519 (N.Y. Sup. Ct. 2000) (policy classification limitation limited policy to painting and, therefore, policy did not cover fire damage arising out of roofing repair work performed by insured).

[21] In general, dictionaries define a distributor as one that markets or sells merchandise, including a wholesaler who sells goods to other businesses for retail sale to the ultimate consumers of the product.  *See Black's Law Dictionary* (9th ed. 2009) ("A wholesaler, jobber, or other manufacturer or supplier that sells chiefly to retailers and commercial users."); *Webster's Third New International Dictionary Unabridged* ("one that distributes or one that markets a commodity").  Numerous other sources, however, contemplate that one function of a distributor, in addition to reselling a product, is the assembly of goods for resale.  *See, e.g.*, Clark & Clark, *Principles of Marketing* 207 (1942) ("Generally wholesalers, jobbers, and distributors are defined as those who "assemble goods for resale to retailers."); Executive Legal Summary 140, *Products Liability Applied to Distributors* (Nov. 2012) (noting that distributors often assemble or repair products furnished by manufacturer); Tex. Civ. Prac. & Rem. Code Ann. § 82.002(d) ("For purposes of this section, a wholesale distributor or retail seller who completely or partially assembles a product in accordance with the manufacturer's instructions shall be considered a seller."); Ok. St. T. 12 § 832.1.D. ("[A] wholesale distributor or retail seller who completely or partially assembles a product in accordance with the manufacturer's instructions shall be considered a seller."); *see also Fronckowiak v. King-Kong Manufacturing Co., Ltd.*, 189 A.D.2d 1054 (N.Y. Sup. Ct. 2001) (holding that genuine issue of material fact existed as to whether distributor failed to assemble bicycle properly). *But see Phillips Petroleum Co. v. CIR*, 101 TC 78, 102 (1993) (Tax Court defined "distributors" to include only "an entity that does not change the product it acquires[, but] merely acts as a middleman in the sale of the property to the retailer or...ultimate consumer.").  To the extent the term distributor as used in the Policy is ambiguous, the term must be construed in favor of the insured.  *See Auto-Owners Ins. Co.*, 756 So.2d at 34.

its assembly was incidental to Neubert's operations as a "distributor." As a result, Plaintiffs' claims against Neubert fall within the scope of the Policy, including the Classification Limitation Endorsement.

### *Liability for the Stipulated Final Judgment*

In order to hold Markel liable for the Final Judgment in the underlying litigation, Plaintiffs must prove coverage under the Policy, a wrongful refusal to defend by Markel, and that the settlement was reasonable and reached in good faith. *Quintana v. Barad*, 528 So.2d 1300, 1301 n.1 (Fla. 3d DCA 1988). The claimant has the initial burden of producing evidence sufficient to make a *prima facie* showing of reasonableness and lack of bad faith, but the insurer has the ultimate burden of proof. *Steil v. Florida Physicians' Ins. Reciprocal,* 448 So.2d 589, 592 (Fla. 2d DCA 1984). Plaintiffs have met their burden of establishing coverage, a wrongful refusal to defend, and the reasonableness of the settlement.

For the reasons discussed above, Plaintiffs have demonstrated that the Policy, with any ambiguity interpreted liberally in favor of the insured and against the insurer, provides coverage for the accident. The accident arose from, and related to, work being performed in connection with Neubert's status as a distributor of Mu-Meters and involved operations necessary or incidental to the premises and operations identified in the Policy.

### *Duty to Defend*

Under Florida law, "an insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage.*" Jones v. Fla. Ins. Guar. Ass'n*, 908 So.2d 435, 442–43 (Fla. 2005); *see Irvine v. Prudential Prop. & Cas. Ins. Co.*, 630 So.2d 579, 579-80 (Fla. 3d DCA 1993) ("The duty is determined solely by the

allegations against the insured, not by the actual facts, nor the insured's version of the facts."). The duty to defend is broader than the duty to indemnify. *Jones*, 908 So.2d at 443. An "insurer must defend even if the allegations in the complaint are factually incorrect or meritless." *Jones*, 908 So.2d at 443; *see, e.g.*, *Creative Hospitality Ventures, Inc. v. United States Liability Ins. Co.*, 655 F.Supp.2d 1316, 1325 (S.D. Fla. 2009). In contrast, an insurer "has no duty to defend a suit where the complaint upon its face alleges a state of facts which fails to bring the case within the coverage of the policy." *Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So.2d 533, 535 (Fla. 1977).

*Coverage*

The Second Amended Complaint in the underlying litigation alleges facts that fairly and potentially brought the suit within the Policy's coverage. *See Morgan Int'l Realty, Inc. v. Dade Underwriters Ins. Agency*, 617 So.2d 455 (Fla. 3d DCA 1993); *Grissom*, 610 So.2d at 1307. The Second Amended Complaint alleges that Neubert brought a rim to Safe Start and asked Safe Start to mount a tire on the rim which ultimately led to Mr. Szczeklik's injury. *See, e.g.,* Second Amended Complaint (Dkt. 2-3), ¶¶ 7-11. Based on these allegations, combined with its knowledge of Neubert's business,[22] Markel should have reasonably concluded that the assembly of the rim and tire related to Neubert's operations and involved a component of a product that Neubert distributed (*i.e.*, the Mu-Meter), thereby potentially triggering coverage under the Policy.[23] Moreover, to the extent there was any doubt as to whether the allegations in the Second Amended Complaint triggered the duty to defend, Markel should have resolved any doubts in favor of its insured. *See Jones*, 908

---

[22] As noted previously, an insurer is deemed to know its insured's business. *See* footnote 3, *supra*.

[23] In contrast, the allegations in the Second Amended Complaint do not expressly state where the mounting of the tire was to take place (although it can be inferred) or that the assembled rim was a completed product so as to trigger the exclusions relied on by Markel in denying coverage.

So.2d at 443; *Grissom v. Commercial Union Ins. Co.*, 610 So.2d 1299, 1307 (Fla. 1st DCA 1992);

*Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So.2d 810, 814 (Fla. 1st DCA 1985).

*Reasonableness of Settlement*

Plaintiffs argue that they have met their burden of making a *prima facie* showing of the reasonableness and good faith as to the stipulated final judgment. Plaintiffs purport to rely on the Affidavit of Shannon Kelly (Dkt. 15-3) who served as defense counsel for Neubert in the underlying litigation. Ms. Kelly avers that the Settlement and Final Judgment were entered into as a result of arms-length negotiations between Neubert and Plaintiffs and were not tainted by bad faith, fraud, or collusion. The record also contains certain medical records and vocational assessments (Dkt. 15-4) opining that Mr. Szczeklik is unemployable and will continue to face substantial future medical costs. Based on this evidence, Plaintiffs have made a *prima facie* showing that the $375,000 settlement was reasonable and in good faith.

Markel relies on its contention that it had no duty to defend in the underlying litigation as a complete defense to Plaintiffs' request for summary judgment as to the reasonableness of the stipulated judgment. Because Markel had a duty to defend and Plaintiffs established the existence of coverage as well as the reasonableness of the settlement, the burden shifted to Markel to show that the settlement was unreasonable or tainted by bad faith. Markel has failed to submit argument or evidence on the issues of reasonableness or bad faith and, therefore, is liable to Plaintiffs for the amount of the Final Judgment in the underlying litigation.

## Conclusion

Markel has failed to meet its burden of demonstrating that under no reasonable interpretation could the allegations in the underlying litigation have fallen within the coverage afforded by Policy.

*See Beaver*, 466 F.3d at 1296.   The undisputed evidence demonstrates that the exclusions relied on by Markel in refusing to defend Neubert in the underlying litigation and in denying coverage are inapplicable to the facts.   As a result, Markel had a duty to defend Neubert in the underlying litigation.   Because Markel failed to do so, and because coverage exists under the Policy, Markel is liable to Plaintiffs for the amount of the Final Judgment in the underlying litigation together with post-judgment interest.   Accordingly, it is

**ORDERED AND ADJUDGED**:

(1)   Defendant's Motion for Summary Judgment (Dkt. 12) is **DENIED**.

(2)   Plaintiffs' Motion for Summary Judgment (Dkt. 15) is **GRANTED**.

(3)   The Clerk is directed to enter **FINAL JUDGMENT** in favor of Plaintiffs and against Defendants in the amount of $375,000 together with prejudgment interest at the rate of 4.75% *per annum* (.0130137% *per diem*) through the date of the federal judgment.   The federal judgment shall accrue post-judgment interest at the applicable federal rate.

(4)   The Court reserves jurisdiction to consider applications for costs or attorney's fees, if any, in accordance with Local Rule 4.18.

(3)   The Clerk is directed to **CLOSE** this case.

**DONE AND ORDERED** this 30th day of April, 2013.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to:
Counsel of Record